IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

TOMMY DWAYNE HALL — PLAINTIFF

v. — Civil No. 04-4131

H. L. PHILLIPS, Sheriff, Miller County, Arkansas; JEFF BLACK, Head Jailer, Miller County Sheriff's Department; and LT. HONZA, Miller County Sheriff's Department — DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Tommy Dwayne Hall, a former inmate of the Miller County Jail, brings this pro se civil rights action pursuant to 42 U.S.C. § 1983. Hall originally asserted a variety of claims. However, defendants were granted summary judgment on all claims except Hall's claims that defendants' failed to protect him from attack by fellow inmates and failed to provide him with adequate medical care.

On March 9, 2006, an evidentiary hearing was held. At the conclusion of the hearing, the case was taken under advisement pending preparation of this report and recommendation.

## I. EVIDENCE PRESENTED

At the evidentiary hearing, the court heard the testimony of a number of witnesses. For purposes of discussion, the court will summarize in the first person the testimony given.



AO72A
(Rev. 8/82)

*Tommy Dewayne Hall*

I am an Arkansas Department of Correction (ADC) inmate. I'm at the Eastern Arkansas Regional Unit in Brickeys, Arkansas. I'm serving a sentence of thirty-five years for possession of controlled substances. I was convicted on August 24, 2005.

On April 12, 2002, I was booked into the Miller County Jail (MCJ). I was being booked in at the same time as Nekial Garfield.

While I was being booked in, some trustees came to the door and threatened my welfare. No matter where I went in the jail, they said they could get to me. They were threatening me with sexual assault.

Sergeant Janice Nichols, Mike Wade, and Kevin Hampton stated they were going to put me up on the fifth floor. I saw Shawn Nash was on the board. He had tried to run me off the road. I told them what had happened and they put me up on fifth floor anyway. Lieutenant Bonnie Honza was not around when I was being booked in.

I called Regina Sanders and tried to get her to call and tell them what the deal was with Nash. Then the fighting occurred. It went on for awhile and then suddenly stopped. An officer said they got a call and came to check on me. I told him to get me a grievance form.

Honza saw me after the first attack. She knew I had been attacked. I wrote a sick call slip. The jailers, Mike Wade, Royce Green, and Lamont Hampton, said they didn't have any grievances. Hampton was the one who was called to check on me.

Before the second fight occurred, I saw a trustee who was on the fifth floor "max" side over on the general population side. The inmates were giving me funny looks so I gave the

guard, Officer Ferguson, a note. I called and told Renita Brown about the inmate. I called Renita through another source. I called Regina Sanders and told her to call Renita Brown and have her call up there.

I was standing by a camera. The inmate from "max" side was not supposed to be over on the population side. I knew two inmates involved in the assault, Nash and Quinn Morrison.

The second assault was the worse. I had a cut on the right side of my eye. My lips and gums were swollen. I had bruises.

An officer came up there and looked at my face. My face was bleeding and bruised up. I saw that Ferguson still had the note I gave him about the inmate being over on the population side. I said there is the note I gave him. It is right there.

I saw Honza and Nichols. I didn't see Jeff Black. I don't know if he was jail administrator there.

Honza was the one who put me in the lock-down cell after the second fight. She saw me bleeding. I was on lock-down for three days. I was bleeding real bad. I took care of myself. I told them I needed to see a doctor or nurse.

Not long after the second fight, I got transferred from the MCJ to Bowie County. I was in the Bi-State Justice Building Detention Center when I was arrested on May 9, 2002, and charged with possession of crack cocaine with intent to deliver. *Plaintiff's Exhibit* 7.



**AO72A**
**(Rev. 8/82)**

You wear orange there. In the pictures, plaintiff's exhibits 1 and 2,[1] I was wearing orange. These had to be taken at Bi-State but they say, Texarkana Arkansas Police Department. I can see puffiness and swelling on my face in one picture.

You wear blue at Bowie County. I'm not really sure how long I was in Miller County, I believe it was less than a month. I believe I was transferred to Bowie County on May 9, 2002.

I bonded out of Bowie County. My family bonded me out because they saw no one was doing anything.

I got a job at Tyson Foods. I started somewhere around May 20th. I got fired before sixty days was up.

Renita took some pictures about a week after I got out of MCJ. You can see the cuts in my gum. You can see the swelling. I didn't go see a doctor for any injuries that occurred while I was in the MCJ. I didn't see a doctor the whole year I was out.

***Renita Brown***

I dated Hall for about ten years. In 2002, we were in and out of a relationship.

I don't recall if I got the call from Hall after he was booked in or after he was in his cell. Hall called me collect at home. He said he had conflicts outside the jail with people who were now in the jail. He thought there was going to be trouble.

He said he had an altercation with some prisoners. He asked me to call and speak with someone in authority because he felt he had been done wrong.

---

[1]The first picture indicates it was taken on May 9, 2002. The second picture is dated May 15, 2002.



AO72A
(Rev. 8/82)

I can't remember how many instances were involved. Hall called me numerous times. I don't know how many times Hall called. Hall would call for conversation. The operator said the calls were being recorded and monitored and could be disconnected at anytime.

I cannot vouch for anything at the facility because I wasn't there. I can't say anything about a note.

I recall Hall calling and telling me again that he had been assaulted. Hall stated that he had been jumped on. He asked me to call a supervisor and check into what was going on. I did that.

Hall had been jumped on twice. He said he had told a guard and they were moving him to lock-down. I called a supervisor to get them involved. I called the Sheriff's office one time and talked to a man. I said Hall had been in two fights and was put on lock-down. The man told me that it had been taken care of. I was told Hall would be on lock-down until they figured it out. I left it alone at that.

Hall didn't tell me he had been hurt other than having a swollen lip. I don't recall how long it was before Hall was transferred to Bowie County. I took photos of him at my home when he was released from Bowie County. I don't remember what date the pictures were taken. He also went into detail about what happened. He told me he had been jumped on.

I recall Hall's upper lip was swollen and the left side of his face was swollen. The first picture, plaintiff's exhibit 3, shows the left side of his face is swollen. His face just looked different. It doesn't show any bruising on the left side of his face.



AO72A
(Rev. 8/82)

The next pictures, plaintiff's exhibits 4, 5, and 6, shows his lip is swollen. The swelling is up at the top. The last picture, plaintiff's exhibit 6, show the inside of the lip where it had been cut.

Hall was in the MCJ off and on. He lived with different women. He never had a job in 2002 when he was with me. He did work at Tysons but I don't know if it was in 2002. It wasn't for a real long time. Hall had a reputation for having fights.

***Nekial Garfield***

I was booked into the MCJ at the same time as Hall. There was a bunch of cursing and fussing going on.

I recall Hall telling the officer about another inmate. Hall told them about a car chase incident. I was with Hall for the car chase incident. Hall was telling the jailer about the feud. The officers all knew about the feud. I don't know the defendants.

I remember going to a bond hearing. It was three of four days later. I saw Hall but I didn't recognize him. His face was so beat up. One of the jailers told me that Hall had been beaten up on the way to the hearing.

I didn't talk to Hall at the bond hearing. Hall didn't make bond. He was held at the MCJ longer.

I think I was in there six or seven days. I bonded out. After I left, I called to check on Hall. They said Hall was fine. Hall called me once. Mostly his family and I were calling to see how much it would take to get him out. We called a lot. I kept in touch with Hall even after he went into the state prison system.



AO72A
(Rev. 8/82)

I used to date Hall. I dated him from 2000 until 2005.

***Torrey Davis***

I'm an ADC inmate. I was in the MCJ.

I saw the fight upstairs. I don't know if it was Hall's first day there or not. It was the only fight I saw involving Hall. There were five, six, or seven inmates involved. Hall was involved. I don't know what his role was. I didn't really pay attention to Hall's condition after the fight.

***Kim Owens***

I recall Hall being booked into the MCJ in April of 2002. I was not present when he was booked in. Hall tried to call me but there was a block on my phone. I don't have long distance.

I recall there being conflicts between Hall and Nash. Something went down. Hall should have been removed.

I found out about the first incident from Geneva. Geneva repeatedly called and spoke with people about Hall. I recall Geneva saying she had talked to Honza and that it was under control.

I never called. I never talked to Hall at any time while he was in the MCJ in 2002. I never talked to anyone at the jail. Any information I have came from Geneva or hearing Regina talk about it.

I saw Hall the day following his release. I don't recall how he got out. I saw him at his house. He had big bruises. One of his eyes was bloody. I remember him complaining about his face.



AO72A
(Rev. 8/82)

*Regina Sanders*

I recall Hall being booked into the MCJ in April of 2002. Hall contacted me during booking to let me know he was in jail.

Hall said they put him on a floor with a guy that he was not close friends with. Hall wanted me to contact his family members. I called the jail one time and got put on hold. I never got to talk to anyone so I called Renita Brown.

I recall the incident with Nash. I don't know the date but Hall called me from work and asked me to take him something to eat. A car kept getting up close behind and zooming up and hanging out like he was going to shoot us.

I recall the second attack at the jail. Hall asked me to contact his family. He said he had gotten jumped on and needed someone to contact the MCJ and see if they could have him moved.

After I visited Hall and saw his condition, I called one time. I never called back. I didn't get to tell them what was going on.

Hall's visitation was on a Tuesday I believe. His eye was swollen, his lip busted, and he had blood on his clothing.

I don't know the defendants. I was not present at booking. My information came from Hall.



AO72A
(Rev. 8/82)

*Bonnie Honza*

I've been retired now almost four years. July of 2002 was the last time I was employed. From September of 1990 to July of 2002, I was lieutenant at the old MCJ. I was the head jailer.

The jail was located on the fourth and fifth floors. The Sheriff's Department and my office were in the basement. I oversaw all paperwork and billing for the jail.

Most days I would go up to the office area of the jail and pick up paperwork. Sometimes I also went into the kitchen area. If I went into the area where the inmates were, it caused a big commotion. I didn't do it very often.

I recall Hall's name. Not his face. No one ever called me about Hall. I wasn't on the same phone system as the jail or the sheriff. I had one phone line with its own number. Employees could radio me.

I know Shawn Nash. He was in for child support and on work release. He would stop by my office. I didn't know of the problems between Hall and Nash.

I was not aware specifically of any conflict between Hall and any inmates. If there is a problem, the two people should be separated. Once the inmates are separated, either the sergeant or I should be contacted. The sergeants are supervisors and they all went to school to learn rules, procedures, etc. I enforce the rules.

I don't make housing assignments, booking officers do. Sometimes the officers called and told me when inmates had to be separated.

Each shift has a sergeant who supervised the booking employees. There were four sergeants. Ms. Nichols was one of them.



AO72A
(Rev. 8/82)

I made medical and dental appointments. If an inmate went to the clinic, I went with him. If someone was hurt, I knew about it. There were never any occasions when an inmate needed medical care and didn't get it.

I didn't know Hall was hurt. I was not aware of Hall making a request for medical care in 2002. I was not aware of Hall needing medical care during that time.

The cameras in the jail were for surveillance. They were not hooked up to recording equipment. The phone system did not make records of phone calls.

I don't recall Officer Ferguson bringing me a note after Hall was attacked. There was a grievance procedure. If an inmate asked for a grievance, the inmate was given one. The grievance was turned back in and the sergeant would answer it unless it involved him. If it involved the sergeant, the grievance went to the captain.

***Jeff Black***

I'm currently a security director at a school district. Between August of 2002 and August of 2005, I was the warden of the new MCJ. The new jail was opened in December of 2002 and I started before that getting things ready. Before that, I worked at the Sheriff's office as a warrants officer and/or narcotics officer from 1997 until August of 2002.[2]

I arrested Hall at the new facility in 2002. I arrested him outside of the courtroom.

I wasn't aware that Hall was in the old jail facility. I was in the Sheriff's Department in the basement of the facility. I have no information or knowledge about anything we talked about today.

---

[2]Plaintiff's exhibit 8 are the defendants' supplemental responses to interrogatories. The responses indicate Jeff Black was the jail administrator from 1999 until present. The responses are dated June 2, 2005.



AO72A
(Rev. 8/82)

*Sheriff H.L. Phillips*

This is my eighteenth consecutive year as Sheriff. I was the Sheriff in 2002.

The MCJ is directed under my supervision. Whatever the staff does there, reflects back on me. Honza was the warden of the jail at that time. It was her responsibility to run the facility. If she neglected her duties, it reflected on me.

I know Hall as a law enforcement officer. I did not know Hall was in the jail in April of 2002. The jail held one hundred and thirty inmates in 2002. Unless an inmate was in the jail on a class Y felony or was charged with a very serious crime, I wouldn't know he was there.

I was not aware that Hall was assaulted or contends he was assaulted or denied medical care. He submitted no grievances or requests for medical care. I checked the infirmary records and found none pertaining to Hall. There were no grievance records or written complaint records for Hall.

I was not made aware of Hall's complaints. There are always complaints. Verbal threats among inmates are handled primarily by staff. An inmate can be placed in protective custody if necessary. If a problem between inmates was brought to the attention of a correctional officer, it should have been acted on. How it is handled would be a chain of command decision.

At that time, the cameras were not set up to record. There were no tapes made of phone conversations the inmates had.

## II. DISCUSSION

As noted above, Hall has asserted both a failure to protect claim and a denial of medical care claim. We will address each claim in turn.



AO72A
(Rev. 8/82)

*Failure to Protect*

Due process 'protects pretrial detainees both from deliberate exposure to violence and from failure to protect when prison officials learn of a strong likelihood that a prisoner will be assaulted.'" *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988). Similarly, the Eighth Amendment imposes a duty on the part of prison officials to protect convicted prisoners from violence at the hands of other prisoners. *Perkins v. Grimes*, 161 F.3d 1127, 1129 (8th Cir. 1998). In addressing failure to protect claims brought by pretrial detainees, the Eighth Circuit has noted that the pretrial detainees are entitled to at least as much protection as a convicted inmate and has applied Eighth Amendment analysis to claims brought both by pretrial detainees and convicted prisoners. *Perkins*, 161 F.3d at 1129- 1130. *See also Thomas v. Booker*, 784 F.2d 299 (8th Cir. 1986)(analyzing a pretrial detainee's failure to protect claim under the same Eighth Amendment analysis used for similar claims brought by prisoners.).

In *Riley v. Olk-Long*, 282 F.3d 592 (8th Cir. 2002), the court stated:

> An Eighth Amendment claim for failure to protect is comprised of two elements. First, an "inmate must show that [he] is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the inmate must establish that the defendant prison official recklessly disregarded that risk. *Jackson v. Everett,* 140 F.3d 1149, 1151 (8th Cir. 1998). "For the purposes of failure to protect claims, it does not matter ... whether a prisoner faces an excessive risk of attack for reasons personal to [him] or because all prisoners in [his] situation face such a risk." *Hott v. Hennepin County, Minn.,* 260 F.3d 901, 906 (8th Cir. 2001) (internal quotations omitted). The question is whether a prison official has a "sufficiently culpable state of mind," meaning that [he] is deliberately indifferent to an inmate's safety. *Farmer,* 511 U.S. at 834 (internal quotation omitted). The prison official's state of mind is measured by a subjective, rather than an objective, standard. *Id.* at 838-39; *see also Jackson,* 140 F.3d at 1152 ("[D]eliberate indifference must be viewed from [defendants'] perspective at the time in question, not with hindsight's perfect vision."). "[T]he official must both be aware of facts from which the inference could be drawn that



AO72A
(Rev. 8/82)

> a substantial risk of serious harm exists, and [he] must also draw the inference." *Farmer,* 511 U.S. at 837.

*Riley,* 282 F.3d at 595. *See also Krein v. Norris*, 309 F.3d 487 (8th Cir. 2002)

Thus, to prevail, Hall must show: (1) that his incarceration with Nash posed a substantial risk of serious harm, and (2) each of the defendants knew of and disregarded an excessive risk to Hall's safety. *Pagels v. Morrison*, 335 F.3d 736, 740 (8th Cir. 2003).

To establish the second component, Hall must show that each defendant acted, or failed to act, with deliberate indifference to Hall's safety. *Id.* Negligence is not sufficient. *Id.* Even if the conduct was unreasonable, this is not enough because "reasonableness is a negligence standard." *Id.* at 742 (internal quotation marks and citation omitted). Further, the United States Court of Appeals for the Eighth Circuit has noted that "threats between inmates are common and do not, under all circumstances, serve to impute actual knowledge of a substantial risk of harm." *Id.* at 740-741 (internal quotation marks and citation omitted).

Hall's failure to protect claim fails because there is simply no basis on which the named defendants may be held liable. First, with respect to Jeff Black, both Sheriff Phillips and Black testified Black was not the jail administrator or warden in April or May of 2002 when the incidents complained of by Hall occurred. Honza also testified she was the head jailer during the relevant time period.

Hall testified he did not speak to or see Black during this time period and did not know if he was the jail administrator. Instead, Hall relies solely on defendants' supplemental responses to interrogatories where it indicates Black was the administrator from 1999 through the date of



AO72A
(Rev. 8/82)

the interrogatory response. *See Plaintiff's Exhibit* 8. This single interrogatory response is insufficient to establish Black knew of and disregarded an excessive risk to Hall's safety.

Second, with respect to Honza, we find Hall has failed to establish that Honza had any notice of a threat of serious injury to Hall or any reason to know Hall was in danger of being attacked by Nash or others. Although Hall contended Honza was personally aware of the situation, no testimony was offered to support this assertion. Neither Hall nor any of the witnesses he called indicated they had spoken with Honza. She testified she had not talked to Hall, or to anyone about Hall, and had not seen any grievance, complaints, or incident reports regarding him or any attack or threatened attacks against him. No evidence was introduced suggesting inmates were in general at risk because security was lax or that there had been a pattern of, or even a number of, attacks against inmates.

At most, the evidence suggests the booking officer failed to properly respond to Hall's concerns about being housed on the same floor as Nash and that Ferguson failed to respond quickly enough when given a note by Nash. However, Hall did not point to any policy or procedure that he believed was inadequate or unconstitutional. He did not point to any lack of training or supervision on Honza's part that could be said to have caused, or contributed to, the alleged constitutional violation at issue.

Finally, with respect to Sheriff Phillips, there is no evidence to suggest he was even aware of the fact that Hall was incarcerated at the MCJ in April of 2002. No testimony suggests Sheriff Phillips was placed on notice of Hall's need for physical protection or that he had reason



AO72A
(Rev. 8/82)

to know that Nash posed a threat of serious injury to Hall. Nor is there any evidence to suggest the inmates were incarcerated under conditions posing a substantial risk of serious harm.

A supervisor may not be held liable for a section 1983 violation on the basis of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Sheriff Phillips did not directly participate in the alleged constitutional violation; There is no evidence that a failure on his part to properly supervise and train the offending employee caused a deprivation of constitutional rights. *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996) (*citing Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir.1994); *Mark v. Nix*, 983 F.2d 138, 139-40 (8th Cir. 1993)(section 1983 liability requires some personal involvement or responsibility). Further, the record in this case is devoid of any suggestion of the existence of a custom or policy on which to hold Miller County liable.

***Denial of Adequate Medical Care***

As Hall was a pretrial detainee, his denial of medical care claims are more properly analyzed under the due process clause of the Fourteenth Amendment than the Eighth Amendment. *Hartsfield v. Colburn*, 371 F.3d 454, 456-457 (8th Cir. 2004). "The standard to be applied in assessing a pretrial detainee's claim of due process violations . . . is not entirely clear." *Spencer v. Knapheide Truck Equipment Co.*, 183 F.3d 902, 906 (8th Cir. 1999)(citation omitted). Nevertheless, "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." *Id.* (*quoting City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983).



AO72A
(Rev. 8/82)

In the absence of a clearly binding standard, the Eighth Circuit in analyzing inadequate medical care claims brought by pretrial detainees has applied the Eighth Amendment's deliberate indifference standard. *See e.g., Hartsfield*, 371 F.3d at 456-457; *Spencer,* 183 F.3d at 905-06; *Hall v. Dalton*, 34 F.3d 648, 650 (8th Cir. 1994)(analyzing a pretrial detainee's claim of inadequate medical care under the deliberate indifference standard). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). Additionally, "'[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.'" *Jolly*, 205 F.3d at 1096 (*quoting Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir.1995)). *See also Gregoire v. Class*, 236 F.3d 413, 417 (8th Cir. 2000)("To establish a constitutional violation, it is not enough that a reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk.").

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only



AO72A
(Rev. 8/82)

if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S. Ct. 995, 1000, 117 L. Ed. 2d 156 (1992). "A medical need is serious if it is obvious to the layperson or supported by medical evidence." *Moore v. Jackson*, 123 F.3d 1082, 1086 (8th Cir. 1997) (per curiam) (internal quotation and citation omitted).

"[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). In *Dulany v. Carnahan*, 132 F.3d 1234 (8th Cir. 1997), the Eighth Circuit said:

> As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment. Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976). Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation. *Id.* at 106, 97 S. Ct. at 292.

*Dulany*, 132 F.3d at 1239. *See also Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001).

Hall's denial of medical care claim fails because he cannot show that a serious medical need was ignored. Hall testified that the second of the two assaults was the most serious. He indicates he suffered a cut on the right side of his eye, his lips and gums were swollen, and he had bruises. Hall testified that his injuries did not heal until after he was released from incarceration.



AO72A
(Rev. 8/82)

However, the booking pictures admitted into evidence, *plaintiff's exhibits* 1 and 2, and the pictures taken by Brown, *plaintiff's exhibits* 3 through 5, exhibit barely discernable injuries. Brown also testified that when Hall called her and told her about the attack he only mentioned that the left side of his face was swollen. Sanders, who visited Hall at the jail, testified his eye was swollen and his lip was split. Even if Hall's testimony regarding his injuries is considered fully credible, these conditions do not constitute serious medical needs. *See Williams-El v. Johnson*, 872 F.2d 224, 230-231 (8th Cir. 1989)(A split lip and a minor bruise do not constitute serious medical needs). *See also Pinkston v. Madry*, ___ F.3d ___, 2006 WL 618675, *8 (7th Cir. March 14, 2006)(A split lip and a swollen cheek do not rise to the level of an objectively serious medical need); *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)(Injured detainee who only required a sling, an eye-patch and some disinfectant for abrasions did not have a serious medical need); *Wesson v. Oglesby*, 910 F.2d 278, 284 (5th Cir. 1990)(Inmate's swollen, bleeding wrists from handcuffs that were too tight do not constitute a serious medical need such that a delay in provision of medical care constitutes deliberate indifference).

## IV. CONCLUSION

I therefore recommend that judgment be entered in defendants' favor and this case be dismissed.

**The parties have ten days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are**



AO72A
(Rev. 8/82)

**reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 17th day of April 2006.

/s/ Bobby E. Shepherd
UNITED STATES MAGISTRATE JUDGE



AO72A
(Rev. 8/82)